### Adkins v. Rasnick, et al.

(Decided January 17, 1913.)

#### Appeal from Pike Circuit Court.

Contracts—Fraud—Evidence.—In an action by the widow of an intestate to invalidate on the ground of fraud a settlement made with her by the purchaser of the intestate's real estate, and based on a contract between her and the intestate's children, evidence examined, and held insufficient to sustain the charge of fraud.

J. S. CLINE, for appellant.

CHILDERS & CHILDERS, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming on cross appeal and reversing on original appeal.

Moses Coleman died intestate and a resident of Pike county, Kentucky, in the year 1907. He had been married three times. He left surviving him a widow, Mary Coleman, who afterwards intermarried with one Rasnick, and ten children by former marriages. Of these children, nine of them were of age at the time of his death, and one of them was an idiot. A short time before his death, Moses Coleman sold and conveyed to J. H. Adkins a tract of land consisting of about 300 acres, upon which he and his family resided. The purchase price was $2,500, for which Adkins executed two notes, one for $2,000, due in eight months, and one for $500, payable when possession was given. M. C. Justice, D. B. Coleman and Winright Adkins were sureties on these notes.

Moses Coleman's death took place before possession was given. At the December term, 1907, of the Pike county court, James A. Scott, on motion of the widow of Moses Coleman, was appointed administrator of Moses Coleman's estate, and entered into bond as required by law. On January 11, 1908, J. A. Scott, as such administrator, brought suit on the purchase money notes in question against the purchaser, J. H. Adkins, and asked that the land be sold. Adkins' demurrer to the petition was overruled, and he then filed an answer and set-off. In the first paragraph he pleaded that the $500 note had not become due because possession of the premises had not been given. In the second paragraph he pleaded that Moses Coleman and wife represented to him that their title to the land in question was perfect and unencumbered, with the exception of the coal on the land, which had been sold. Relying upon these representations, he purchased the land, and afterwards ascertained that such representations were false and fraudulent in that Coleman and wife had previously sold and conveyed to the Virginia Mining & Improvement Company all the mineral, oil, salt-water, gas and all timber necessary for mining purposes on the land. He also pleaded that Coleman and wife had previously sold to the E. K. Railway Company the right of way through said land. He further pleaded that by reason of the existence of the easement on the land in favor of the E. K. Railway Company, the land was worth $2,000 less than it would be if free from such easement, and this sum he pleaded as a set-off against the $2,000 note. Plaintiff's demurrer to each paragraph of the answer and set-off was sustained. Adkins afterwards filed an amended answer, making more specific the allegations of his original answer. The demurrer to the first paragraph of the amended answer, alleging that the $500 was not due because possession had not been given, was overruled. The demurrer to the second paragraph was sustained, and the defendant given leave to amend.

On February 3, 1908, Mary Coleman, the widow of Moses Coleman, entered into a contract with the children of Moses Coleman, which, omitting the names of the parties and their signatures, is as follows:

"Witnesseth that Mary Coleman, widow of Mose Coleman, deceased, and each of the above heirs has this day agreed on a division of the real estate and personal property of the said Mose Coleman deceased, and the

agreement is this the said Mary Coleman the said widow of the said Mose Coleman agrees to take one heirs part of the land if recovered of J. H. Adkins, and it is to be laid off so as to include the home place where the dwelling house is now located and she agrees to take all of the personal property, that the said Mose Coleman had at his death, and she agrees to sell one black mule named Jim if necessary to pay the debts of her said husband and what money there is left after paying the said debts if any it is to belong to the said Mary Coleman, widow of the said Mose Coleman, and each of the above heirs agrees to allow the said Mary Coleman, one heirs part of the said estate of Mose Coleman, deceased and all of the personal property, that the said Mose Coleman had at the time of his death as above set out, that if the said land is recovered, from the said J. H. Adkins, that L. T. Damron, J. W. Ford and J. E. Ratliff go upon the said land and lay it off for the widow and the heirs as near equal in value and area as possible, and each heir will draw his lot and be content with the lot as drawn and J. M. Bowling and A. F. Childers are employed as our attorneys to represent us in the said estate, and to do whatever legal work is to be done in settlement of the said estate.''

On August 18, 1908, the following agreement was made between Mary Coleman and J. H. Adkins:

''This agreement made and entered into this August the 18th, 1908, between Mary Coleman of the one part and J. H. Adkins of the other part. Whereof it is agreed that Mary Coleman is to have the land that she now lives on as her part of the estate, of Mose Coleman deceased, to be laid off by metes and bounds, and is to have one-eleventh of the land now occupied by her and her part to be laid off where she now lives, in consideration whereof J. H. Adkins and wife agrees to make her a general warranty deed to same, whereof she agrees to release and relinquish all of her widows dowry now in the notes whereof J. A. Scott admrs is plaintiff and J. H. Adkins, D. R. Coleman and M. C. Justice is defendant, whereof she agrees to deliver J. H. Adkins possession by January 1st, 1909, whereof it is further agreed that she deliver unto J. H. Adkins the sum of $227.27.''

On October 27, 1908, J. H. Adkins and wife, in consideration of Mary Coleman's interest in the two notes, one for $2,000 and the other for $500, then in the hands of J. A. Scott, administrator, ''said interest being one-

eleventh of said note," conveyed to Mary Coleman a certain portion of the farm which he had purchased from her and her husband. The tract so conveyed consisted of about 30 acres, and on it was located the home, barn, outhouses, etc.

About the same time Adkins settled with the ten children of Moses Coleman, paying them the following amounts: Caldona Maynard, $105; Paralee Coleman, $135; Nellie Bartley, $150; John Coleman, $100; Eliza Coleman, $200; Miles Coleman, $150; Willie Coleman, $125; Jennie Ward, $150; Melvina New, $150; Dave Coleman, $150, or a total of $1,415. It further appears that the administrator of Moses Coleman received $203.51 from the Daniels Creek Tie & Lumber Cmpany, of which $135.10 was received by Paralee Coleman, the idiot, while the balance of $68.45 was applied to the costs of the action. This $68.45 must be added to the sum of $1,415, which makes $1,483.45. In addition to this, Adkins paid the attorney for the administrator a fee of $75, making the total paid by him $1,558.45.

From some of the children Adkins took deeds, while from others he took receipts.

Subsequently in the suit of J. A. Scott, Administrator, &c., v. J. H. Adkins, the following order was entered:

"It appearing that the defendant, J. H. Adkins has paid to, and taken receipts therefor from, each of the heirs of Moses Coleman, deceased, except Paralee Coleman, an idiot, and to the widow of said Moses Coleman, their respective proportionate parts of the purchase money notes in the suit herein, and has paid to the said J. A. Scott, plaintiff, as administrator as aforesaid, the sum of $135.10, the proportionate part of the said idiot heir, Paralee Coleman, in said notes, and it therefore further appearing that this suit has served its purpose, it is hence dismissed at defendant's cost."

On January 15, 1909, Mary Coleman sold to the Daniels Creek Tie & Lumber Company, a firm composed of Henry Ratliff, W. E. Johnson and J. E. Ratliff, the land which Adkins had conveyed to her, the consideration being $300.

After selling this land to the Daniels Creek Tie & Lumber Company, Mary Coleman intermarried with one Resnick, and moved to West Virginia.

In 1910, Mary Coleman Resnick instituted this action against J. H. Adkins. She charged in the petition that by fraud of Adkins she was induced to believe that she

was entitled to only a child's part in the purchase money notes for which her husband sold the farm, whereas she was entitled to one-half of the notes. She asked that the deed to her by Adkins, and the contract she made with him, be. set aside, and that she recover one-half of the notes. Adkins denied that he was guilty of any fraud, and pleaded the judgment in the case of J. A. Scott, Administrator, &c., v. J. H. Adkins, in bar of her right to recover. Soon after bringing the action, plaintiff, Mary Coleman Rasnick, tendered to Adkins a deed from the Daniels Creek Tie & Lumber Company to the land which she had sold to them. On final hearing the chancellor adjudged that the deed from J. H. Adkins to the plaintiff, dated October 27, 1908, be canceled, and that plaintiff recover of J. H. Adkins the sum of $882.50, with interest from January 1, 1909. It was further adjudged that to secure same plaintiff had a lien on the land conveyed by Moses Coleman to J. H. Adkins, and this land was directed to be sold. On the margin of this judgment appears the following assignment:

"I hereby assign $800 of this judgment to J. E. Ratliff.

This March 1, 1912.

Mary Coleman Rasnick,<br>
by J. E. Childers,<br>
Attorney for Plaintiff."

From that judgment Adkins appeals, and Mary Coleman Rasnick prosecutes a cross-appeal.

In addition to the facts set out above, Mary Coleman Rasnick testifies to the sale of the land, and to the execution of the notes in question. After her husband's death, she had conversations with her children and Adkins. Upon being asked the direct question whether or not Adkins told her what interest or part she had in the notes and Mr. Coleman's estate in any way, she answered: "I don't know exactly whether he did or not. It has been a right smart bit, and to tell the truth I can't remember." She was again asked the question: "Well, did he talk about your interest in your estate—did he?" She answered: "Of course we all talked now. We begged John to give the land back. We was all wanting him to give the land back. He hadn't paid nothing for it." Witness then spoke of her going to town with her children and going to the office of J. M. Bowling. Upon being asked if John Adkins was there that day, she replied: "Yes, I think he was; I will not say whether

it was that day or not.'' She further says that they told her in Mr. Bowling's office what they wanted her to do. Her son, Dave, talked to her. He and Green had made the agreement, and they thought it was the best thing that she could do. She just agreed to anything they wanted her to do. After testifying to the fact that the $227 was first given her, she says that she afterwards agreed to take a piece of land, which she sold for $300. She says that if she had known what interest she had in the notes, she would not have accepted the land. But she further says: ''I was trying to get it without any squabble or trouble, for I had heard the old man say so many times that when he was dead and gone they would just law.'' At the time of her husband's death, he owned two mules, two milk cows and four or five head of hogs. Six or seven hogs were killed the day before he died. He also had on hand 150 bushels of corn, a lot of hay and fodder and about 30 bushels of Irish potatoes. Witness had about $22 in money, which was all there was on the place. She afterwards sold one of the mules, and paid her husband's debts. On cross-examination, in answer to the question, ''did you and the heirs make a contract in Mr. Bowling's office?'' witness replied: ''Yes, they made one and I agreed to whatever they made. I didn't make much in it. To tell the truth, I was troubled, and the way they made it I agreed to it.'' That agreement was that she was to take a child's part, a one-eleventh part. She further says that she was not to get a one-eleventh part of the whole estate, but was to get one-eleventh in addition to the personal property left by the old man; that is, the live stock, furniture, etc. Under the agreement, she was to take the home place. Afterwards, Henry Ratliff went up and marked off the land. Adkins was not present when this was done. Upon being asked by Adkins if she did not express to him that she only wanted what she and the heirs had agreed that she should take, and that was one-eleventh part, she said: ''I told you I was willing to take that if I could get it without any trouble.'' In answer to the question, ''You didn't have any trouble getting the deed to the land you sold to Henry Ratliff, did you?'' she answered: ''No, I don't know as I had any trouble about getting it, what little I got.'' She also said that Adkins and she never had any trouble, but the trouble was mostly with the heirs; that it had all helped. Witness further testified that if she hadn't been afraid to stay there, she would

not have sold the home place for any man's money. She didn't know but what she might get burnt out. J. M. Bowling testifies to plaintiff's and her children's coming to his office on the occasion when the contract between them was drawn up. At that time he and A. F. Childers were partners. The contract was drawn in their office, and he thinks both he and Childers had something to do with it. In answer to the question whether or not Adkins was there when the contract was drawn, witness said: "He might have been in there a time or two, but I don't know as he was sitting by when it was drawn." Upon being shown the contract above set out, he said that that was the contract that was drawn in their office. At the time the contract was drawn, he thinks they had the notes with them, that witness further testified that if the Mose Coleman land was his, he would not want a railroad to go through the bottom for less than $500.

A. F. Childers, who is now one of the attorneys for the plaintiff in this case, testified that he was, about January, 1907, a partner of J. M. Bowling, and plaintiff and her children came to their office to get them to represent them. He further says that if he helped to make the contract between the plaintiff and the heirs of Moses Coleman, he had forgotten it. He says that no contract was talked of in his presence. He further says that the only contract that was talked about was the one of their employment. If he drew the contract in question he had clearly forgotten it. He never at any time advised the widow what her interest in the notes was. Does not remember being present when the contract was signed. Upon being asked if he saw the defendant there, he says: "My recollection is that he was there." He afterwards says: "I don't remember distinctly whether it was the same day they came to talk the matter over with us or not, but I do remember an occasion about that time that these parties came to our office to talk over the matter, and Mr. Adkins came in and raised some conversation and they all left with him."

Adkins denies that he had anything to do with making the original contract between plaintiff and her husband's children. He never made any fraudulent representations to her of any kind. In making the settlement with plaintiff he simply carried out the agreement the plaintiff had made with the children, and she was perfectly willing to settle on this basis.

The proof is this case utterly fails to show any fraud on the part of Adkins. The contract between plaintiff and the children of her husband was drawn in the office of Bowling & Childers. It is by no means certain from the evidence that Adkins was even present when it was drawn, but even if he was, it does not appear that the contract was entered into because of any false representations made by him to plaintiff. It may be true that plaintiff would not have entered into the contract if she had fully understood her rights, although she claims that she was willing to make a settlement because her husband advised her that the children would go to law with her after his death. All that we can gather from her testimony is that the matter of her being entitled only to an heir's part was talked over between her and the children. Whether this was done from ignorance or from a desire on the part of the children to defraud her does not appear. At any rate, if any fraud was practiced on the plaintiff it was practiced by others than Adkins. Adkins was not a party to the contract. He did not induce the making of the contract. The contract was entirely between her and the children. The contract provided that she was to get a particular piece of land. Her own representative laid off the tract which she desired. The tract so laid off was deeded to her by Adkins. In doing this he simply carried into effect the contract which she had made with the children. He settled with the children on the basis of this contract. While some of them were willing to settle for less, he settled with others for more than they would have been entitled to had it not been for the contract that they had made with their stepmother. Plaintiff says that she was perfectly willing to accept the tract deeded to her, provided she could get it without trouble, and admits that she did not have any trouble in getting it.

There being nothing in the record to show that the contract of settlement between the plaintiff and the children of her husband was brought about by any act of fraud on the part of Adkins, or that his subsequent settlement with plaintiff on the basis of that contract was induced by any fraudulent representations made by him, we conclude that the chancellor erred in giving judgment in favor of plaintiff.

Judgment affirmed on cross appeal, and reversed on original appeal and cause remanded with directions to enter judgment in favor of defendant.